

Daniel L. Greenberg
*President and
Attorney-in-Chief*

**FEDERAL DEFENDER DIVISION • EASTERN DISTRICT OF NEW YORK**
16 COURT STREET, BROOKLYN, N.Y. 11241   TEL: (718) 330-1200   FAX: (718) 855-0760



*Federal Defender Division*
Leonard F. Joy
*Attorney-in-Charge*

Eastern District of New York
Thomas J. Concannon
*Attorney-in-Charge*

January 20, 2004

The Honorable Carol Bagley Amon
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

<u>U.S.A. v. Richard Singh, 03 CR 1076-01 (CBA)</u>

Your Honor:

**PRELIMINARY STATEMENT**

My client, Mr. Richard Singh, is being prosecuted for a crime committed by others, including Michael Adams and Erroldo Weatherly, the lead co-defendants in an insider-drug-smuggling case that the government made public in its Complaint of November 21, 2003 (03 M 1753). I write (i) to move that the Court order that the government immediately comply with its <u>Brady</u> obligations to provide discovery about that Conspiracy, including (a) tapes of conversations between the two men recorded by the government on July 17, 2003 (the day of Mr. Singh's arrest), and (b) other evidence referred to below, and (ii) to notify the Court that the defense will present evidence of that Conspiracy at trial because it is relevant and exculpatory.[1]

**BACKGROUND**

The government arrested Mr. Singh at approximately 3:30 p.m. on July 17, 2003, after his arrival at Kennedy International

---

[1] This submission attaches the Adams Complaint (Ex. A); my discovery letter to the government with my initial <u>Brady</u> request of Oct. 14, 2003 (Ex. B); the government's only written response to any of my <u>Brady</u> requests in its letter of Oct. 20, 2003 (Ex. C); and my renewed <u>Brady</u> request to the government of Dec. 5, 2003 (Ex. D).



Airport on a North American Airlines flight from Guyana for a gym bag containing cocaine. The government blamed Mr. Singh for the bag because it had a baggage tag with his name and a claim check matching his ticket even though he did not retrieve the bag and immediately and continuously denied that the bag was his. The defense theory has been that the bag pinned on Mr. Singh actually belonged to insiders who failed to retrieve their contraband before it got to the passenger luggage retrieval area. This theory was reflected in my Brady request of October 15, 2003 (before I had any inkling of the Adams Conspiracy), which requested

> any and all information that might tend to show that the suitcase containing cocaine was being smuggled by and/or intended to be retrieved by . . . any employees or contractors working for North American Airlines, another airline, or the airport, or any other persons with access to restricted areas in the airports in either Guyana or New York ("Insiders"), including but not limited to any and all evidence of smuggling by Insiders in this case, other drug smuggling cases from Guyana or at John F. Kennedy International Airport.

(Ex. B at 1.) Furthermore, in a phone conversation on October 16, 2003, I explained to the prosecutor the defense theory that someone like an airline employee was supposed to pick up the bag, and I asked that the prosecutor make inquiries of agents as to evidence of such insider drug smuggling on flights from Guyana and flights of North American Airlines.

The Adams Complaint -- which defense counsel learned of through the newspapers rather than any government Brady disclosure -- sets forth precisely the type of conspiracy that defense counsel had inquired about. Federal agents, with their suspicions aroused by abandoned luggage stuffed with drugs on flights arriving from Guyana (Ex. A, ¶¶12-15, pp. 20-22), uncovered a massive conspiracy of insiders, such as baggage handlers and maintenance persons who "have virtually unfettered and unsupervised access to arriving international flights prior to their routine inspection by federal authorities." (Id., ¶7, p. 6.) These insiders were intercepting drug-laden luggage before it got to the passenger luggage retrieval area on flights hailing most importantly from Guyana (id., ¶¶6, 13, 15; pp. 6, 20, 21), including ones of North American Airlines (id., ¶¶106-109, pp. 106-113).

Beyond the preliminaries about the drug-smuggling from Guyana that sparked the investigation, the Adams Complaint introduces its series of drug-smuggling episodes with a seven-page section

entitled: "The Attempted Narcotics Importation of July 17, 2003." (Ex. A, ¶¶32-39, pp. 32-40.) According to the government, on the evening of July 17 - the same day as Mr. Singh's arrest - the two lead co-conspirators Adams and Weatherly were expecting a bag of cocaine from Guyana on a Universal flight, they failed to retrieve it, and Weatherly concluded "that the narcotics may not have been on the flight." (Id., ¶34, p. 35.) Evidence of the Adams Conspiracy, including the tapes of the intercepted phone conversations beginning at approximately 7:17 p.m. between Adams and Weatherly (id., ¶32, p. 32), exculpates Mr. Singh. Adams and Weatherly failed to intercept the cocaine that they were expecting because it was unloaded from the earlier North American flight out of Guyana, forwarded to the passenger luggage retrieval area, and mistakenly pinned on Mr. Singh.

Despite this evidence of Mr. Singh's innocence, the government has failed to disclose a scintilla of Brady material in response to either my original request of October 15 or my renewed one of December 5. In response to the first request, the government has denied in phone conversations that there was any Brady material[2]; and in response to my second request, it has still failed to set forth its position or make clear when it will do so.[3] With the trial fast approaching, the defendant has no choice but to move that the Court order that the government comply with its Brady obligations by:

- producing the tapes and related documentation of all conversations between Adams and Weatherly on or about July 17, 2003. A month-and-a-half ago defense counsel specifically

---

[2] In a phone conversation and an exchange of voice mail messages on October 29 and 30, 2003, I asked that the government make a specific written response to my Brady request beyond the government's boiler-plate language in its letter of October 20. Assistant U.S. Attorney ("AUSA") Michael Asaro told me that the government had no specific Brady information but that he would not put anything further in writing.

[3] I have had a series of phone conversations with the prosecutors assigned to both this case and the Adams case in an attempt to explain my Brady request orally and to elicit a clear response from the government or a commitment as to when the government might provide me with such a response. Those conversations were on Dec. 5, 2002 (AUSA Asaro); Dec. 9 (AUSA Michael Ramos); Dec. 11 (AUSA Ramos and AUSA Steven D'Alessandro); Dec. 16 (AUSA Ramos); Jan. 5, 2004 (AUSA Asaro); Jan. 12 (AUSA Ramos); Jan. 12 (AUSA Asaro); and Jan. 15 (AUSA Asaro).

requested any "tapes, transcripts, reports, memoranda and notes of any kind about the intercepted phone conversations between Adams and Weatherly on July 17 referred to in the Adams Complaint (Session #733 referred to in ¶32, Session #741 referred to in ¶33, Session #746 referred to in ¶34, Session #753 referred to in ¶35, and an unnumbered Session referred to in ¶36)." (Ex. D.)

- allowing defense counsel to examine the physical evidence, including the luggage containing drugs seized in connection with the Adams conspiracy between August and October 2002 (Ex. A, ¶¶13, 60n.25; pp. 20-21, 59), and on Jan. 23, 2003; Sept. 14, 2003; Sept. 20, 2003; Oct. 5, 2003; Oct. 24, 2003; and Nov. 4, 2003 (id., ¶¶8, 15, 54, 65, 69, 71, 106, 108; pp. 7, 18, 21-22, 53, 65, 69, 70, 106-108, 111-113); and

- producing, as defense counsel requested in its second Brady request, of "any and all tapes, transcripts, reports, memoranda and notes of any kind by law enforcement agents, inspectors, police officers, detectives, and employees, whether federal, state or local, relating in any way to attempted narcotics importation on July 17, 2003, from Guyana to Kennedy Airport . . . ." (Ex. D.)  This request includes (but is not limited to) all Reports of Investigation, underlying notes and debriefings of witnesses and cooperating defendants referring in any way to the July 17, 2003 events and to methods of drug smuggling from Guyana and attempts to do so.

**ARGUMENT**

Based on the Due Process, Compulsory Process and Confrontation Clauses, the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," Crane v. Kentucky, 476 U.S. 683, 690 (1986), and that includes "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967).  A jury cannot determine whether the government has proven a defendant's guilt beyond a reasonable doubt if the government may pick and choose its evidence while barring the defendant from presenting additional evidence casting the same events in a totally different light. See Kyles v. Whitley, 514 U.S. 419, 434-435 (1995)(a Brady violation is shown if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); Tate v. State, 981 S.W.2d 189, 193 (Tex.Crim.App. 1998)(a jury cannot "properly convict or acquit absent the opportunity to hear proffered testimony bearing upon a theory of defense and weigh its credibility along with other evidence in the case.").

4

The constitutional right "to present a complete defense" includes the opportunity to show that there are alternative suspects, i.e., that another person (or persons) might have committed the crime. That was the point of Chambers v. Mississippi, 410 U.S. 284 (1973), in which the Supreme Court reversed a conviction because the trial court had barred the defendant from presenting evidence that another man had admitted that he had committed the crimes. Id. at 287. Since then courts have regularly recognized that evidence is favorable for the defense when it shows the existence of alternative suspects. See Mendez v. Artuz, 2000 WL 722613 (S.D.N.Y., Mag. Report and Recommendation), at *9-10, and cases cited therein.

The acts of the conspirators in the Adams Conspiracy and the Adams-Weatherly conversations on July 17 exculpate Mr. Singh because they show precisely such alternative suspects, i.e., that they, not the defendant, committed the crime. Obviously, Mr. Singh need not prove that Adams and Weatherly are guilty "beyond a reasonable doubt" but only that there is a "reasonable possibility" that they committed the crime, for such a "reasonable possibility" creates a "reasonable doubt" as to the defendant's guilt. Johnson v. U.S., 552 A.2d 513 (Dist.Col.App. 1989); People v. Robinson, 133 A.D.2d 859, 859-60, 520 N.Y.S.2d 415, 416 (2d Dept't 1987).

Here the "reasonable possibility" that Adams and Weatherly committed the crime -- their connection to the crime for which Mr. Singh is being prosecuted -- is clear from at least four objective factors in terms of the crime, place, time and method.

The crime charged against Adams/Weatherly and against Mr. Singh is exactly the same: importing cocaine into the U.S.

The location of the acts of Adams/Weatherly and the present crime is exactly the same: Adams and Weatherly were expecting a bag of cocaine from Guyana to arrive at Kennedy International Airport in New York. Mr. Singh was arrested after a flight from Guyana at that same place.

The time of the acts of Adams/Weatherly and the present crime is exactly the same. The government itself has proffered evidence of Adams and Weatherly engaging in their criminal conspiracy on the very day that Mr. Singh was arrested. The lapse of four hours between Mr. Singh's arrest (at approximately 3:30 p.m.) and the Adams-Weatherly conversations (beginning at approximately 7:17 p.m.) supports rather than undermines the connection, for it shows why Adams and Weatherly failed to intercept the contraband they were expecting.

The method used by Adams/Weatherly also explains the presence of the gym bag now attributed to Mr. Singh. As the Adams Complaint

5

shows, Adams, Weatherly and their co-conspirators were regularly notified what luggage contained drugs, they tried intercepting that luggage, and they often missed pieces. The missed pieces were forwarded to the passenger luggage retrieval area, never claimed and seized by federal agents. The cocaine-laden gym bag here fits to a tee the profile of a bag intended for intercept by an Adams/Weatherly co-conspirator but missed by them.

In addition to the opportunity to show alternative suspects, the constitutional right "to present a complete defense" includes the opportunity to answer questions that jurors are bound to ask. In Crane v. Kentucky, the Supreme Court reversed a conviction because the trial court excluded evidence about the physical and psychological environment in which a confession was obtained. In finding that that environment was relevant "to the ultimate factual issue of the defendant's guilt or innocence," the Supreme Court stated: "Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" Crane v. Kentucky, 476 U.S. 683, 689 (1986). Similarly, here Mr. Singh may not be "stripped of the power" and "effectively disabled" from explaining how a drug-laden gym bag reached the passenger luggage retrieval area but was left unclaimed. The acts of Adams and Weatherly, to adopt the words of the Seventh Circuit, "are so intricately interwoven with the facts of the charged crime that to omit the evidence relating to it would lead to confusion or leave an unexplainable gap in the narrative of the crime." U.S. v. Andreas, 216 F.3d 645, 665 (7th Cir. 2000); see also id. ("To omit the evidence would leave unanswered some questions regarding the charged offense.").

For the purpose of putting the government on notice pursuant to Fed.R.Evid. 807, we note that that residual hearsay exception provides one ground for the admissibility of the July 17 tapes. The government has essentially conceded the "circumstantial guarantees of trustworthiness" of the taped conversations in the Adams Complaint itself by relying on them in making out probable cause. Furthermore, the taped conversations have the same "guarantees of trustworthiness" as a co-conspirator statement pursuant to Fed.R.Evid. 801(d)(2)(E). Indeed, the government will almost surely rely on that Rule to move to admit into evidence the exact same tapes at a future trial of Adams and Weatherly. Construing the Federal Rules of Evidence in a way that would allow the government to introduce tapes in trying to prove the guilt of two co-conspirators at their trial but forbid Mr. Singh from introducing those exact same tapes to raise a reasonable doubt as to his guilt at his own trial would deny Mr. Singh the equal protection of the law.

6

**CONCLUSION**

For the foregoing reasons, the defendant respectfully requests that his motion be granted.

Sincerely,

Douglas G. Morris
Staff Attorney
(718) 330-1209

cc: Assistant U.S. Attorney Michael Asaro

   Clerk of the Court

   Mr. Richard Singh