

**FEDERAL DEFENDER DIVISION • EASTERN DISTRICT OF NEW YORK**
16 COURT STREET, BROOKLYN, N.Y. 11241   TEL: (718) 330-1200   FAX: (718) 855-0760

FILED
IN CLERKS OFFICE
★ FEB 2 3 2005 ★
P.M. _____
TIME A.M. _____

Daniel L. Greenberg
*President and
Attorney-in-Chief*

*Federal Defender Division*
Leonard F. Joy
*Attorney-in-Charge*

*Eastern District of New York*
Thomas J. Concannon
*Attorney-in-Charge*

January 28, 2004

The Honorable Carol Bagley Amon
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

<u>U.S.A. v. Richard Singh, 03 CR 1076-01 (CBA)</u>

Your Honor:

**PRELIMINARY STATEMENT**

In its letter to the Court of January 26, 2004 ("Gvt. L."), the government opposes the defendant's <u>Brady</u> motion by arguing that its interpretation of the evidence must prevail. The government, of course, may argue the weight of the evidence to the jury. But the fact that the government has an alternative theory of evidence does not defeat the exculpatory nature of that evidence, for evidence is exculpatory not by proving innocence beyond a reasonable doubt but by having the potential to raise a reasonable doubt about guilt in a juror's mind. Evidence of the conduct of Adams and Weatherly on July 17, 2003, can do just that.

The government moves to quash the defendant's subpoena for the testimony of Special Agent ("SA") Joseph Cangro. But its lead argument is moot because yesterday defense counsel served the subpoena pursuant to the relevant regulations of the Department of Homeland Security ("DHS Regulations"); its second argument is wrong for the same reason its arguments on the <u>Brady</u> issue are wrong; and its third argument is wrong because the government's own self-serving declaration that disclosure of evidence and testimony of its agent might jeopardize an ongoing investigation cannot trump a defendant's constitutional rights to compulsory process and to present a defense.



For these reasons, as detailed below, the Court should grant the defendant's <u>Brady</u> motion and deny the government's motion to quash.

## I.

### THE COURT SHOULD ORDER THE GOVERNMENT TO ABIDE BY ITS BRADY OBLIGATIONS

In discussing its obligations to disclose <u>Brady</u> material, the government seems to announce a disturbing new doctrine, declaring that "[t]ypically, the government's representation that it is unaware of the existence of any <u>Brady</u> material . . . provides a sufficient basis for a court's denial of a defendant's application to compel the government to produce materials pursuant to the <u>Brady</u> rule." (Gvt. L. at 4n.3.) The cited cases, however, stand only for the unexceptional proposition that courts should assume that prosecutors review their files for <u>Brady</u> material in good faith. The cases hardly suggest that courts should presumptively accept the position of prosecutors who risk hindering a defendant's right to present evidence in his defense by refusing to produce exculpatory evidence clearly in their exclusive possession, custody and control.

The government essentially argues that the attempted drug importation by Adams and Weatherly on July 17, 2003, is not exculpatory as a matter of law. The government, however, ignores critical facts.

First, the seizure in this case stood out because the gym bag contained cocaine and nothing else. That peculiarity prompted defense counsel's initial <u>Brady</u> request to the government on October 14, 2003. That peculiarity continues to distinguish this case from other drug courier cases, such as, for example, the "two other cocaine seizures involving Guyana flights within mere days of Singh's arrest." (<u>See</u> Gvt. L. at 5-6.) Both those cases involved cocaine that was hidden in luggage (not immediately exposed to view upon opening the luggage), and they involved luggage that the defendants presented as their own.

Second, the defense theory is that Adams's and Weatherly's unnamed co-conspirators in Guyana made a mistake in forwarding the cocaine. Indeed, the Adams Complaint is replete with examples of Adams co-conspirators making mistakes (<u>e.g.</u>, Adams Complaint, ¶101, pp. 99-101; ¶60, p. 59n.25; ¶65, p. 65), including scrambling for unplanned deliveries (<u>e.g.</u>, <u>id.</u>, ¶41, p. 42). For one conspicuous example, on October 24, 2003, Adams and Weatherly and co-conspirators were expecting a bag with cocaine from Guyana at JFK

2

Airport (id., ¶¶67-68, pp. 67-69); and an abandoned bag with cocaine fitting the description was later seized at Fort Lauderdale International Airport in Florida (id., ¶69, p. 69). Thus, a bag with cocaine destined for Adams and Weatherly showed up on the wrong flight -- precisely what the defense believes happened on July 17, 2003.

The government insists that the only explanation for the missed bag on July 17 is what Adams and Weatherly speculated late in the evening, namely "their belief that the narcotics . . . were never placed on the flight." (Gvt. L. at 5; see Adams Complaint, ¶34, p. 35 ("Weatherly explains to Adams that the narcotics may not have been on the flight.")(emphasis added).) The government ignores any alternatives, including ones offered by Adams and Weatherly themselves, such as Weatherly thinking earlier in the evening that the drugs had got passed them into the luggage area: "[W]hen I realized where it is I could not catch it . . . . It's gone. It's gone. It's gone. I couldn't hold that one." (Id., ¶33, pp. 33-34.) The government also ignores that SA Joseph Cangro believed that later "Adams and Weatherly are still trying to figure out what happened that night." (Id., ¶36, p. 36.) Using the version the government now prefers, the government ignores that drugs put on a flight but not this flight might have been on another flight.

Third, the government places great significance on the purported lack of evidence that the Adams co-conspirators ever noticed Mr. Singh's arrest, for these criminals conducted surveillance that would be the envy of the best law-enforcement agents (see Gvt. L. at 3, 5). The Adams Complaint, however, indicates only that the Adams co-conspirators monitored flights as best they could when they expected shipments, not that they conducted around-the-clock surveillance of the activities of federal law-enforcement agents.

The circumstances here are not "mere facts," as the government suggests (see Gvt. L. at 5), but startling evidence of innocence: Mr. Singh is being prosecuted for a gym bag containing cocaine that he denied was his, that fits the characteristics of a bag intended for inside smugglers, and that arrived on the same day and from the same country as a bag of cocaine expected but never retrieved by inside smugglers. This is Brady material, whose underlying details the government is obligated to disclose and which is relevant at trial on the issue of guilt and innocence.

3

**II.**

**THE COURT SHOULD NOT QUASH THE SUBPOENA FOR THE TESTIMONY OF SPECIAL AGENT JOSEPH CANGRO**

Since the evidence about Adams and Weatherly is relevant (not to mention exculpatory) and the defendant has served the subpoena pursuant to the DHS Regulations, the government's only remaining argument for quashing the subpoena is that fellow Assistant U.S. Attorneys "have informed [the present Assistant] that requiring SA Cangro to testify at this juncture will jeopardize the government's ongoing investigation." (Gvt. L. at 8.) We are aware of no precedent that the government's interests in another prosecution may trump a defendant's rights to compulsory process and to present a defense.

A.  The Defendant's Sixth Amendment Right to Compulsory Process Cannot Be Defeated by the Government's Self-Serving Assertions About Its Prosecution of Another Case.

In arguing its self-interest in pursuing another criminal prosecution, the government packs its legal authority into a parenthetical on a Second Circuit case, which in turn cites a Supreme Court case, for the proposition that "countervailing public interests, such as the state's responsibility for arresting and prosecuting suspected criminals," may qualify a defendant's rights to present a defense and to compulsory process (Gvt. L. at 8-9, relying on Buie v. Sullivan, 923 F.2d 10 (2d Cir. 1990) and Taylor v. Illinois, 484 U.S. 400 (1988)). Neither case, however, supports that proposition or the government's argument at all.

In Taylor, the trial judge precluded a defense witness from testifying in order to sanction defense counsel's blatant and willful violation of the discovery rules and to prevent likely perjured testimony. Taylor v. Illinois, 484 U.S. 400, 405, 416 (1988). The Supreme Court's starting point was that its "cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt," and that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense . . . ." Taylor v. Illinois, 484 U.S. 400, 408 (1988). In carving out a narrow exception, the Supreme Court stressed this: "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." Id. at 412-413. The Supreme Court found that the trial judge had

4

acted appropriately in precluding "presumptively perjured testimony," id. at 416, and that "the case fits into the category of willful misconduct in which the severest sanction is appropriate." Id. at 417.

The "countervailing public interests" referred to in Taylor were the "integrity of the adversary process, . . . the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial," id. at 414-415, which the Court later referred to as "a vital interest in protecting the trial process from the pollution of perjured testimony." Id. at 417. The Taylor case never suggests that the government's "responsibility for arresting and prosecuting suspected criminals" may trump a defendant's Sixth Amendment rights.

Nothing in the circumstances in Taylor supports the government's position here. Defense counsel notified the government early, repeatedly and with specificity of its request for Brady material and then for the evidence about the Adams conspirators on July 17, 2003. In fact, far from facing any surprise, the government has more knowledge of the subpoenaed witness's testimony than defense counsel. And there is no suggestion that SA Cangro would commit perjury.

The government's position is advanced no further by the Buie case. There the habeas petitioner Buie, who was tried for bank robbery, wanted to call Canady as an eyewitness who would exculpate him. But right after the trial began, the state arrested Canady as an accomplice, and Canady then declined to testify by invoking his Fifth Amendment privilege. Buie argued that the state violated his Sixth Amendment right to present a defense by intentionally timing Canady's arrest to keep out his exculpatory testimony. Buie v. Sullivan, 923 F.2d 10, 10-11 (2d Cir. 1990). The Second Circuit rejected Buie's arguments because the police officer on the robbery investigation testified at trial "that Canady had exculpated Buie in a pre-trial interview," id. at 12, and the state did not time Canady's arrest in bad faith. Id. at 10.

The Buie decision turned on four principles, which lead to the opposite result in the present circumstances.

First, "Buie was able to obtain comparable evidence [to Canady's testimony] by other reasonably available means" because "the exculpatory evidence [was] admitted at Buie's trial" through the police officer's testimony. Buie v. Sullivan, 923 F.2d 10, 12 (2d Cir. 1990). Here, the defendant has no alternative means to present the exculpatory evidence than through the testimony of SA Cangro. In response to defense counsel's subpoenas, counsel for both Adams and Weatherly have informed me that their clients will

5

invoke their Fifth Amendment privileges. SA Cangro's failure to testify will result, in the words of the Buie Court, "in a deprivation or loss of that evidence." Id. at 12.

Second, the Buie decision involved constitutional rights in direct competition with each other: Buie's right to present a defense and Canady's right to silence. Unlike Canady, however, SA Cangro has no Fifth Amendment privilege for his knowledge of crimes that he has investigated.

Third, the Buie decision declined to "second guess law enforcement's belief as to when probable cause first existed, so long as . . . probable cause did exist at the time of the arrest." Buie v. Sullivan, 923 F.2d 10, 13 (2d Cir. 1990). Here, the defendant has not questioned or interfered with the government's decisions about probable cause in the Adams case.

Finally, in Buie the state informed Buie of the exculpatory witness, Buie v. Sullivan, 923 F.2d 10, 10-11 (2d Cir. 1990); it did not withhold evidence in its exclusive possession, custody and control. Thus, Buie provides no legal support for the government's argument "that requiring Special Agent Cangro to testify at this juncture will jeopardize the government's ongoing investigation." (Gvt. L. at 8.) That argument makes little sense in the present circumstances anyway. For one thing, the defendant is calling SA Cangro to testify about what he has already sworn to in a Complaint that the government chose to make public (and to publicize). For another, the defendant is asking largely for documents, tapes and material that the government will release soon in the normal course of discovery to the twenty-five co-defendants named in the Adams Complaint.

B.   The DHS Regulations Are Irrelevant.

Yesterday defense counsel served a subpoena for the testimony of SA Cangro on Mr. Michael Kohler, Esq., Office of the Chief Counsel, Immigration and Customs Enforcement, Department of Homeland Security, pursuant to 6 C.F.R. §5.41 et. seq.[1] With

---

[1]

The defendant's position is that the original service of process was valid. The defendant's position is also that the original service of process was the functional equivalent of fulfilling the DHS Regulations, since the prosecutor had all the information required by the Regulations, SA Cangro was functioning in the Adams case in coordination with the U.S. Attorney's Office, and the prosecutor could have met any internal "housekeeping" needs simply by forwarding the Brady submissions (including the Adams Complaint) to the Office of the Chief Counsel. Nonetheless, now that the

6

service of process pursuant to the Regulations, the issue of the method of service of process drops out of this case. In an excess of caution, we add that the government is wrong if it also means to rely on the DHS Regulations for asserting a substantive right to refuse compliance with a subpoena. The government hints at this view when noting that it may consider, pursuant to the DHS Regulations, whether complying with a subpoena would "potentially impede or prejudice an on-going law enforcement investigation." (Gvt. L. at 7, quoting 6 C.F.R. §5.48(b)(6).)

The DHS Regulations are based on a "housekeeping statute," which "simply . . . grant[s] . . . authority to the agency to regulate its own affairs," that is, which authorizes "rules of agency organization, procedure or practice" but does not create "substantive rules." Chrysler Corp. v. Brown, 441 U.S. 281, 309-310 (1979); see also 6 C.F.R. §5.41(g)(the regulations are "intended only to inform the public about the Department [of Homeland Security's] procedures concerning the service of process . . . ."). This "housekeeping statute" "does not in itself create a privilege when no privilege would otherwise exist," Exxon Shipping Co. v. U.S. Department of Interior, 34 F.3d 774, 778n.6 (9th Cir. 1994), and does not "authorize[] agency heads to withhold documents or testimony from federal courts." Id. at 778; see also U.S. ex rel. Touhy v. Ragen, 340 U.S. 462, 467 (1951)(the decision was not "concerned with the effect of a refusal to produce in a prosecution by the United States . . . ."); id. at 472 (Frankfurter, J., concurring)(the case "cannot afford a basis for a future suggestion that the Attorney General can forbid every subordinate who is capable of being served by process from producing relevant documents . . . ."). Now that the defendant has complied with the DHS Regulations, the government may no more rely on them in this Court than the defendant. Cf. 6 C.F.R. §5.41(g)("This subpart . . . may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the Department [of Homeland Security] or the United States.").

---

defendant has also served the subpoena pursuant to the Regulations, the entire issue is moot.

**CONCLUSION**

For the foregoing reasons and all the reasons stated in my letter brief to the Court of January 20, 2004, the Court should grant the defendant's <u>Brady</u> motion and deny the government's motion to quash.

Sincerely,

Douglas G. Morris
Staff Attorney
(718) 330-1209

cc:   Assistant U.S. Attorney Michael Asaro

     Clerk of the Court

     Mr. Richard Singh